Ramsey Hanafi, SBN 262515
Gelian Belong, SBN 355109
QUINTANA HANAFI, LLP
1939 Harrison St., Ste. 202
Oakland, CA 94612
Tel.: (415) 504-3121
Fax: (415) 233-8770
ramsey@qhlegal.com
gelian@qhlegal.com

*Attorney for Plaintiff*
Alejandro Villageliu

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALEJANDRO VILLAGELIU**, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>**RXVANTAGE, INC.**, a Delaware corporation; and **DOES 1 through 10**, inclusive,<br><br>Defendants. | **CASE NO.:** 2:26-cv-00360-PA-BFM<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff ALEJANDRO VILLAGELIU (herein "Plaintiff") brings this action against RXVANTAGE, INC. (herein "Defendant") and DOES 1 through 10 (collectively "Defendants") for (1) retaliation in violation of Cal. Lab. Code section 1102.5; (2) retaliation in violation of Cal. Lab. Code section 98.6; (3) wrongful termination in violation of public policy; (4) breach of written contract; (5) breach of Covenant of Good Faith & Fair Dealing; (6) failure to pay wages pursuant to Cal. Lab. Code section 204; (7) violation of Cal. Lab. Code sections 206 and 206.5; (8) failure to pay all wages upon termination.

## NATURE OF THIS ACTION

1. This is an action for relief from Defendant's violation of the California Labor Code.

2. Defendant violated Plaintiff's rights during his employment by failing to fulfill its obligation under the California Labor Code.

3. Plaintiff now seeks compensatory, general, and punitive damages, reasonable attorneys' fees, and costs, as well as other appropriate relief as determined by this Court for Defendant's violations of Plaintiff's rights.

Plaintiff hereby alleges as follows:

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

5. Plaintiff was hired in Los Angeles County, and events giving rise to Plaintiff's claims occurred in Los Angeles County.

6. Additionally, in section VI of the Parties' Commission Plan Agreement, attached as Exhibit A and incorporated herein, Plaintiff and Defendant consented to California law and personal jurisdiction in this Court as to all claims herein. All prior Commission Plans included this same language. Additionally, section 9 of Plaintiff's original offer letter and employment agreement, attached as Exhibit B and incorporated herein, includes the same mutual agreement to California law and the personal jurisdiction of this Court.

7. The amount in controversy in this matter exceeds $75,000.

## THE PARTIES

8. Plaintiff is a natural person and a United States citizen.

9. Since on or about November 20, 2021, Plaintiff has been domiciled in Miami-Dade County, Florida. Throughout that time and to the date of filing this Complaint, Plaintiff has maintained his primary residence in Miami-Dade County, worked in the state of Florida, and intends to remain in Florida indefinitely.

10. Plaintiff was hired by Defendant in or around April 2020 in Los Angeles, California, at which time Defendant was also headquartered in Los Angeles.

11. Pursuant to Defendant's "Corporation – Statement of Information", attached as Exhibit C, Defendant is a Delaware corporation, now headquartered at 225 Dyer Street, Floor 2 Providence, RI 02903, and licensed to do business in California. Moreover, Defendant has and

continues to maintain its Mailing and Principal Executive Office address as 225 Dyer Street, Floor 2 Providence, RI 02903. Finally, Defendant's Chief Executive Officer and Secretary, Daniel Gilman, has and continues to maintain a business address at 29 Knapton Street Barrington, Rhode Island 02903.

12. Defendant maintains an office in Orange County, California, and continuously does business in this state with numerous pharmaceutical entities and health care providers, with whom it has significant market penetration.

13. This Court has personal jurisdiction over Defendant because Defendant consented to jurisdiction in California, purposefully availed itself of the privileges of conducting activities in the California and established minimum contacts sufficient to confer jurisdiction over Defendant, and the assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

14. Defendant has had and continues to have continuous and systematic contacts with the state of California sufficient to establish general jurisdiction over Defendant.

15. Defendant advertises, employs workers, maintains offices and contracts with businesses in California.

16. At all material times and for all purposes relevant to the claims made herein, Plaintiff was an "employee" within the meaning of the California Government Code.

17. At all material times and for all purposes relevant to the claims made herein, Defendant was an "employer" within the meaning of the California Government Code.

18. Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1 to 10 and therefore sue those Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of those fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned Defendants.

19. Plaintiff is informed and believes and thereon alleges that each of the Defendants herein were, at all times relevant to this action, the agents, employees, representing partners,

supervisors, managing agents, joint venturers, joint employers of the remaining Defendants and were acting within the course and scope of that relationship. Plaintiff is further informed and believes and thereon alleges that each of the Defendants gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants. Defendants are sued both in their own right and on the basis of respondeat superior.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. Defendant's Services

20. Defendant offers subscription service platforms (software as a service, or SaaS) to pharmaceutical, biotech, and medical device companies that allow those companies' field representatives to book and manage meetings with health care providers.

21. The industry grows out of the reality that many physicians do not want pharmaceutical representatives to simply walk into their practice unannounced and scheduling lunch-and-learn sessions with representatives from multiple companies is an administrative burden.

22. There are two general user groups of Defendant's services: on the one hand health care providers' ("HCP") offices that may sign up and utilize Defendant's service for free, and on the other pharmaceutical entities' sales representatives that pay for a license to utilize Defendant's platform, either by signing up individually with their company email or through a larger agreement with the company itself.

23. Defendant's clients are some of the largest pharmaceutical companies in the United States. They typically have contractual agreements with Defendant that require them to pay for the number of active licenses that they have utilized in a quarter.

24. Defendant utilizes a pool of individual HCPs derived from National Provider Identifier ("NPI") numbers. An NPI is a unique number associated with a specific prescriber (i.e., a specific individual HCP or an organization, such as a hospital, clinic, or group). Defendant's platform associates NPIs with specific locations of practice within its network.

25. A client typically provides Defendant with a list of sales representatives and their assigned NPIs. Sales representatives are then provided individual 'active' licenses so they can attempt to market products to HCPs they are targeting.

26. Licenses can be activated monthly, weekly, or on demand. At the end of a quarter a "true up" would occur. If active licenses exceeded the amount allotted in the agreement, true ups would result in a client owing more than the baseline amount reflected in the agreement.

27. As Defendant's HCP network grows, more of its clients' sales representatives require licenses to utilize Defendant's services.

28. Defendant utilizes the alleged size of its HCP network as a key point in marketing services to its clients.

**B. Plaintiff's Role**

29. Plaintiff joined Defendant as an independent contractor in or around April 2020.

30. He had extensive industry experience, and close relationships to numerous senior decision-makers at pharmaceutical entities across the United States. His tenure was immediately successful. He was promoted from an independent contractor to full-time employee, effective November 1, 2020, with the title of Executive Vice President – Head of Enterprise.

31. In this role, Plaintiff's role was significantly expanded reported directly to one of Defendant's co-founder, owner, and Chief Executive Officer Daniel Gilman ("CEO D. Gilman").

32. During his tenure, Plaintiff more than tripled Defendant's "Enterprise" client base resulting in significant revenue increases for Defendant.

33. When Plaintiff began, Defendant's primary target in the pharmaceutical space was in the oncology sector.

34. Searching for more growth, Defendant branched into other specialties (such as immunology, dermatology, rheumatology, gastroenterology, and neurology). As time went on, Plaintiff's emphasis shifted, with a greater focus on acquiring new clients and offering new solutions developed by Defendant to existing clients.

35. In connection with that shift in focus, Plaintiff began reporting to co-founder and Chief Marketing Officer, Jeremy Gilman ("CMO J. Gilman").

36. During this time, Plaintiff still had weekly one-on-one meetings with CEO D. Gilman, and their relationship remained positive.

37. In the fourth quarter of 2023, Plaintiff helped deliver a record-breaking quarter that was able to accelerate growth into 2024.

38. During his tenure Plaintiff repeatedly received positive feedback and recognition for his performance.

**C. Plaintiff Learns of Defendant's Overbilling**

39. In or around January 2025, Plaintiff learned that two similar long-standing clients had complained about the amount that they had been asked to pay in true ups for the previous year, as the number of active licenses for which they had been billed exceeded their forecasts.

40. Plaintiff realized that these two large clients had been billed for more licenses than necessary—that is, that the client had been charged for licenses for its former sales representatives and for individuals who were not sales representatives at all.

41. Digging deeper, Plaintiff realized that this overbilling was rampant across Defendant's multi-specialty business (i.e., business with clients that extended beyond just oncology). In a sample of approximately 50% of multi-specialty business clients, Plaintiff found all of them were being overbilled.

42. Some clients had paid for more than 200 unneeded licenses.

43. This was the result of errors on both sides of Defendant's service base. On the one hand, non-active physicians were included in Defendant's HCP network. On the other, Defendant was upgrading, creating, and/or retaining licenses for clients' agents who had no need for them.

44. In effect, Defendant was: (a) over-activating licenses for non-sales agents, (b) re-activating and upgrading "ghost" accounts for inactive or former agents of its clients based on outdated information, and (c) failing to remove inactive NPIs (i.e., old contact information associated with physicians who were no longer associated with an active medical practice).

45. With respect to overactivation of Defendant's client's licenses: Plaintiff learned that non-sales agents of Defendant's clients had been charged for licenses, despite lacking a need for same. This included nurse educators ("NEs"), account managers ("KAMs"), medical science liaisons ("MSLs"), field reimbursement managers ("FRMs") and others in non-sales roles as well as those who were in leadership positions rather than customer-facing sales representatives. This

was the case despite the fact that lunches were typically what was scheduled by way of Defendant's platform and many of these positions are explicitly restricted from engaging in lunches with HCPs and medical office staff by their company guidelines.

46. With respect to reactivating and upgrading inactive or "ghost" accounts, Defendant was relying on outdated NPI target information (often dating back years before the contract with the client was established) and not on information provided by the client. Many of these users were either no longer employed by the client or didn't need a license in their current role or territory.

47. With respect to failing to remove non-active HCPs: Defendant was relying upon outdated NPIs associated with HCPs who were no longer at any practice on the network. This was the result of Defendant failing to screen out old NPI numbers. A practical result of this was that there were HCPs on its list no longer located at an active office or never had an office connected with him or her to begin with.

48. The result of these practices was that many of Defendant's largest clients were being charged for a significantly greater number of licenses than they needed.

49. Further, in or around 2023, Defendant, in its pursuit of unchecked growth, removed safeguards implemented by Plaintiff that were designed to increase transparency and protect both the clients and the Company's relationships with them.

**D. Plaintiff Presents His Findings to Defendant's Senior Leadership**

50. On or about February 14, 2025, Plaintiff presented his findings to Defendant.

51. CEO D. Gilman, CMO J. Gilman, Defendant's California-based Chief Financial Officer, Tom Case ("CFO Case"), and Defendant's Senior Vice President of Client Services ("SVP CS") attended the presentation.

52. Plaintiff's presentation included an extensive slideshow that provided clear visual representations of these findings.

53. Plaintiff identified four sources of "excess accounts" (i.e., instances in which Defendant was overbilling clients): (1) creating accounts for client's agents who did not need them; (2) upgrading/reactivating inactive users based on old account/NPI information not provided by the

client; (3) upgrading accounts not on a roster and without any activity; and (4) activating licenses based on Defendant's internal NPI list that were not associated with any HCP office.

54. Defendant's reported growth and revenue was a direct by-product of its overbilling. This was visible not just in the aggregate but in specific sectors (such as neurology, rheumatology, gastroenterology, and dermatology) and with specific clients.

55. Plaintiff proposed a plan of action to correct these issues.

56. Among other things, Plaintiff recommended that a deep analysis of all client rosters be undertaken before the March 31, 2025 true-up, revamping processes for onboarding and roster imports to ensure that only contracted licenses and needed licenses were billed for (and accounts be deactivated where necessary), and efforts to improve transparency for clients to allow better budgeting forecasting expectations.

57. Plaintiff also recommended that accounts be created for sales representatives automatically only if there was an NPI attached to them based on client files (i.e., to prevent the inclusion of past/outdated NPIs entered by former sales representatives), stopping the practice of automatically creating licenses of MSLs, NEs and others, and quarterly reviewing accounts and considering deactivation for those with no meeting activity.

**E. Plaintiff is Retaliated Against for Reporting Defendant's Overbilling, Culminating in his Termination**

58. Defendant's response to Plaintiff's findings were immediately negative.

59. During the meeting, CFO Case and CMO J. Gilman were more focused on finding errors or discrepancies to discredit Plaintiff's analysis than on addressing the issues that had clearly led to overactivation and overbilling.

60. The SVP CS agreed with Plaintiff's findings.

61. Plaintiff was clear that there was a systemic problem with Defendant's billing practices, that at least one client was asking to downgrade its business with Defendant, and that ignoring the billing issues that Plaintiff had identified while attempting to sell other products to them was an unnecessary risk.

62. CFO Case tried to minimize the overbilling (though he recognized that overbilling was occurring) by describing it as "10% [overbilling] is hardly the Titanic sinking."

63. CMO J. Gilman was recalcitrant, and CEO D. Gilman attempted to shift blame to the clients.

64. Following Plaintiff's February 14, 2025 presentation, CFO Case sent an email stating that the issue would be handled by finance and operations, including the new SVP of Operations ("SVP Ops"), and provided a list of objectives. Plaintiff responded that while the list had a number of good ideas, the number one priority should be correcting client rosters before the next quarterly true-up, scheduled for March 31, 2025.

65. Chief Lauck admitted that the issues Plaintiff identified stemmed from Defendant's import process but that correcting the error would require significant manual effort. In essence, she was saying that it would simply cost too much time and energy to correct the rampant overbilling that had been occurring.

66. To Plaintiff's knowledge, Defendant never apprised its clients of his findings during the February 14, 2025 meeting.

67. But Plaintiff began being treated differently by Defendant's C-suite, Chief Lauck, and human resources department.

68. In or around early March 2025, Plaintiff scheduled a meeting with SVP Ops to explain his findings. CFO Case attended the meeting and prevented Plaintiff from presenting the part of his slidedeck that listed his recommendations, stating that C-Suite had not agreed to them and that he didn't want to confuse the SVP Ops with Plaintiff's "perspective."

69. At times, basic questions raised by Plaintiff would be ignored, in particular by CFO Case who was not responsive to numerous email inquiries by Plaintiff regarding updates with one of the clients affected by the overbilling.

70. Chief Lauck asked Plaintiff's assistant to replace him as an administrator on a software utilized by Plaintiff and his team.

71. The human resources team and Chief Lauck also began going around Plaintiff, making requests of Plaintiff's executive assistant that directly contradicted tasks that Plaintiff had assigned (for example, cancelling meetings that he had scheduled with potential candidates that he had recommended to join Defendant).

72. Defendant also removed Plaintiff from the schedule to interview VP of Sales candidates without notifying him, something that had never happened during his tenure and had been part of his job description and role.

73. When Plaintiff proactively inquired about the interview, human resources responded that Plaintiff was no longer needed for the interview and that any questions should be directed to CMO J. Gilman. It was clear that Defendant had instructed human resources to provide no information regarding Defendant's rationale for his last-minute removal from the scheduled interview.

74. It was evident to Plaintiff that he was being retaliated against for reporting and objecting to Defendant's billing practices.

75. As the quarterly true up date (March 31, 2025) was getting closer, Plaintiff saw no indication that any action was being taken to correct client rosters.

76. On or about March 23, 2025, Plaintiff expanded his analysis and alerted the SVP CS that three additional large pharmaceutical clients had been overbilled stemming from more than 700 overactivated licenses.

77. Plaintiff was in the process of formalizing his findings in a second slideshow presentation with CFO Case.

78. During a March 26, 2025, meeting, the SVP CS told CMO J. Gilman during a one-on-one meeting that Plaintiff intended to make another formal presentation of his findings. At that meeting, CMO J. Gilman instructed SVP CS that he did not want Plaintiff making any further presentations to CFO Case.

79. On or about March 28, 2025, CEO D. Gilman and CFO Case called Plaintiff and told him that he was terminated, effective immediately. He was given no explanation for the termination of his employment, and no offer of any type of severance pay.

80. Plaintiff is informed and believes and based thereon, alleges that he was fired prior to the March 31, 2025 true up specifically because Defendant feared that its fraudulent billing would become more widely known to its clients.

///

**F. Plaintiff's Termination and Earned Commissions**

81. On or about March 3, 2024, Plaintiff and Defendant entered into a Commission Plan Agreement which entitled Plaintiff to commission payments. Of note, the Commission Plan Agreement expressly provided that commissions were "earned upon [Defendant] entering into a fully executed Customer Agreement with an applicable Customer while [Plaintiff] is employed by the Company." In other words, Plaintiff need only be employed with Defendant after executing a Customer Agreement to earn his commission share.

82. At or around 9:00 P.M. on March 28, 2025, Chief Lauck emailed Plaintiff a termination letter noting that his last working day was March 28, 2025.

83. Plaintiff replied to Lauck and request a copy of his Commissioner Tracker file in an effort to determine the amount in commissions he was owed to date, which he had previously been informed was at least $65,000, and demanded payment for said commissions pursuant to the Commission Plan Agreement. Plaintiff received no response.

84. On or about April 1, 2025, Lauck sent an updated termination letter to Plaintiff via DocuSign. Notably, the updated termination letter specifically noted Plaintiff's termination as "without cause." Included with the termination letter, was a "Severance Commission."

85. On or about April 4, 2025, Plaintiff spoke with Gilman via phone call to discuss the details of his termination. At the outset of the call, Gilman asserted that he simply wanted to negotiate Plaintiff's departure from the company and avoid discussing the context of Plaintiff's termination.

86. Subsequently, Plaintiff attempted to negotiate his exit with Defendant's legal representatives from Cooley, LLP ("Cooley").

87. On or about April 21, 2025, Cooley's representatives informed Plaintiff that his termination was being changed from "without cause" to "with cause" because he had attempted to negotiate an exit package, which would make Plaintiff ineligible to receive money he had already earned. Specifically, Plaintiff would not be paid his earned commissions.

88. To date, Defendant has not paid Plaintiff any money in connection with his unlawful termination, including earned commissions.

89. On information and belief, Defendant never apprised its clients of his findings. Defendant simply swept the realities of their overbilling under the rug and continued its billing practices.

**FIRST CAUSE OF ACTION**
**Retaliation**
**(Cal. Lab. Code § 1102.5)**

90. Plaintiff re-alleges and incorporates by reference all the above paragraphs as if they were set forth here in full.

91. California Labor Code Section 1102.5 (a) provides that "An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." Labor Code section 1102.5, subsection (b), prohibits an employer from retaliating against any employee who makes an internal complaint about an issue which the employee reasonably believes is a violation of state or federal statute, or noncompliance with a local, state, or federal regulation.

92. Plaintiff reasonably believed that Defendant engaged and continued to engage in unlawful activity when he uncovered Defendant's fraudulent billing practices.

93. Shortly after discovering Defendant's unlawful practices, Plaintiff proactively took measures to disclose his findings to Defendant's leadership team in an effort prevent further violations of the law.

94. Despite acknowledging Plaintiff's reports, Defendant refused to remedy the issues and instead retaliated against Plaintiff by ostracizing him from his job duties, removing him from scheduled interviews for VP of Sales candidates without notice, preventing him from presenting

his recommendations to senior leadership, ignoring his communications, circumventing his authority by directing his assistant to perform contradictory tasks, and ultimately terminating his employment on March 28, 2025, just days before the quarterly true-up date and immediately after learning he planned to make another report of Defendant's fraudulent practices.

95. Plaintiff's raised concern about the legality of Defendant's billing practices was a contributing factor in Defendant's decision to ostracize at work and ultimately terminate his employment.

96. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered harm including lost wages and emotional distress, in an amount to be proven at trial.

97. Defendant's decision to terminate Plaintiff was a substantial factor in causing Plaintiff's harm.

98. On information and belief, in doing the acts alleged herein, Defendant acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights and Plaintiff is therefore entitled to exemplary damages in an amount according to proof at the time of trial.

99. As a further proximate result of Defendant's unlawful conduct, Plaintiff was required to and did retain attorneys and is therefore entitled to an award of attorneys' fees and costs according to proof.

## SECOND CAUSE OF ACTION
**Retaliation**
**(Cal. Lab. Code § 98.6)**

100. Plaintiff re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

101. Pursuant to Labor Code section 98.6(a), "[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter" or "because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to their rights that are under the jurisdiction of the Labor Commissioner, made a written or oral

complaint that they are owed unpaid wages," or "because of the exercise by the employee or applicant for employment on behalf of themselves or others of any rights afforded them.

102. Plaintiff engaged in protected activity under Labor Code section 98.6 when he requested his Commission Tracker file to determine the commissions he was owed and asserted his right to approximately $65,000 in earned commissions.

103. On or about April 1, 2025, Defendant sent Plaintiff a termination letter expressly designating his termination as "without cause" and included a "Severance Commission" document, implicitly conditioning payment of his earned wages on signing a release.

104. After Plaintiff exercised his rights by attempting to negotiate his departure and asserting his entitlement to earned commissions, Defendant retaliated against him by retroactively changing his termination from "without cause" to "with cause" on or about April 21, 2025.

105. Defendant's retroactive change in the characterization of Plaintiff's termination was done solely to avoid paying Plaintiff wages he had already earned and was a direct retaliation for Plaintiff's exercise of his rights under the Labor Code.

106. By conditioning payment of Plaintiff's earned commissions on his agreement to release his claims and then retroactively changing his termination status when he refused to waive his rights, Defendant retaliated against Plaintiff in violation of Labor Code section 98.6.

107. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered harm including lost wages, in an amount to be proven at trial.

108. As a further proximate result of Defendant's conduct, Plaintiff was required to and did retain attorneys and is therefore entitled to an award of attorneys' fees and costs according to proof.

## THIRD CAUSE OF ACTION
## Wrongful Termination in Violation of Public Policy

109. Plaintiff re-alleges and incorporates by reference all the above paragraphs as if they were set forth here in full.

110. It is the policy of the State of California to prevent employers from terminating or otherwise retaliating against employees who report conduct they reasonably believe to be unlawful to a person with authority, as set forth in Cal. Lab. Code § 1102.5.

111. As noted above, Plaintiff engaged in protected activities when he raised concerns about Defendant's systematic overbilling of clients and fraudulent billing practices.

112. Shortly after raising his concerns and despite positive performance throughout his tenure, Plaintiff's employment was abruptly terminated without cause on March 28, 2025, just three days before the quarterly true-up date.

113. Plaintiff is informed and believes, and based thereon alleges, that he was terminated in retaliation for reporting Defendant's unlawful billing practices and to prevent him from making further presentations exposing the extent of the overbilling to additional members of Defendant's leadership team.

114. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered harm including lost wages and emotional distress, in an amount to be proven at trial.

115. Defendant's decision to terminate Plaintiff was a substantial factor in causing Plaintiff's harm.

116. On information and belief, in doing the acts alleged herein, Defendant acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights and Plaintiff is therefore entitled to exemplary damages in an amount according to proof at the time of trial.

117. As a further proximate result of Defendant's unlawful conduct, Plaintiff was required to and did retain attorneys and is therefore entitled to an award of attorneys' fees and costs according to proof.

## FOURTH CAUSE OF ACTION
**Breach of Written Contract**

118. Plaintiff re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

119. Plaintiff and Defendant entered into a Commission Plan Agreement for incentive commission pay on or about March 3, 2024.

120. Pursuant to the express terms of the Commission Plan Agreement, in exchange for his employment, Plaintiff was eligible for commissions "earned upon [Defendant] entering into a fully executed Customer Agreement with an applicable Customer while [Plaintiff] is employed by the Company." In other words, Plaintiff needed only to be employed by Defendant upon execution of a Customer Agreement in order to earn commission.

121. Plaintiff performed all of his duties under the Commission Plan Agreement.

122. Defendant never provided Plaintiff with any notice of his breach of the Agreement or a default of performance.

123. Defendant breached the Written Agreement when it failed to adhere to the express terms related to payment of commissions to Plaintiff.

124. More specifically, Plaintiff earned commissions amounting to approximately $65,000 while he was employed by Defendant that remains unpaid, despite being earned. Defendant breached the Commission Plan Agreement when it failed to pay Plaintiff his wages upon termination.

125. As a direct result of Plaintiff's breach, Plaintiff has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## Breach of Covenant of Good Faith & Fair Dealing

126. Plaintiff re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

127. Defendant breached the implied covenant of good faith and fair dealing by breaching the Commission Plan Agreement described above in bad faith and refusing to honor its contractual obligations, all with the motive of intentionally frustrating and preventing Plaintiff from receiving the full benefit and enjoyment of his contractual rights.

128. Defendant committed bad faith acts including by refusing to honor its contractual obligation of paying Plaintiff all of his earned commissions amounting to approximately $65,000, and subsequently conditioning payment in exchange for a release of his statutory rights.

129. As a result of Defendant's bad faith acts, Plaintiff has suffered damages to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Failure to Pay All Earned Wages**
**(Cal. Labor Code §§ 200, 204)**

130. Claimant re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

131. At all times relevant to this action, Claimant was employed by Respondent within the meaning of the California Labor Code.

132. California Labor Code section 204 requires employers to pay all employees for all work performed on the job.

133. California Labor Code section 200 defines wages to include not only salary and hourly wages but also commissions.

134. During the relevant period, Plaintiff was eligible for and earned commissions pursuant to the express terms of the Commission Plan Agreement.

135. Under the Commission Plan Agreement, Plaintiff earned commissions upon Defendant entering into fully executed Customer Agreements with applicable customers while Plaintiff was employed by Defendant.

136. During the relevant period, Plaintiff earned commissions totaling approximately $65,000 that remains unpaid by securing fully executed Customer Agreements with applicable customers while employed by Defendant.

137. Despite earning these commissions in accordance with the Commission Plan Agreement, Defendant has failed to pay Plaintiff any of the commissions he was owed and to which he is entitled.

**SEVENTH CAUSE OF ACTION**
**Violations of Cal. Labor Code §§ 206, 206.5**

138. Plaintiff re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

139. At all times relevant to this action, Plaintiff was employed by Defendant within the meaning of the California Labor Code.

140. California Labor Code section 206 subsection (a) expressly states that, "In case of a dispute over wages, the employer shall pay, without condition and within the time set by this article, all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed."

141. California Labor Code section 206.5 subsection (a) states that, "An employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee. Violation of this section by the employer is a misdemeanor."

142. Plaintiff earned commissions totaling approximately $65,000 by securing fully executed Customer Agreements with applicable customers while employed by Defendant, thereby satisfying the requirements of the Commission Plan Agreement.

143. On or about April 1, 2025, Defendant sent Plaintiff a termination letter expressly stating his termination was "without cause" and included a "Severance Commission" document.

144. However, after Plaintiff attempted to negotiate his exit package, Defendant retroactively changed his termination from "without cause" to "with cause" on or about April 21, 2025.

145. By refusing to pay Plaintiff commissions that were earned prior to his termination, Defendant violated California Labor Code section 206.

146. By conditioning payment of Plaintiff's earned commissions on his agreement not to pursue his legal rights—and retroactively changing the basis of his termination when he refused to sign a release—Defendant violated California Labor Code section 206.5.

147. To date, Defendant has not paid Plaintiff any of his earned commissions or wages owed upon termination.

///

///

## EIGHTH CAUSE OF ACTION

**Failure to Pay All Wages Upon Termination**
**(Cal. Labor Code §§ 201, 203)**

148. Plaintiff re-alleges and incorporates by reference all of the above paragraphs as if they were set forth here in full.

149. California Labor Code section 201 requires an employer to pay all compensation due and owed to an employee immediately upon termination of employment, including overtime and commissions.

150. California Labor Code section 203 provides that if an employer willfully fails to pay compensation immediately upon termination of employment, as required by section 201, then the employer is liable for waiting time penalties in the form of continued compensation of up to thirty workdays.

151. Defendant willfully failed and refused to timely pay compensation and wages, including unpaid commissions, to Plaintiff.

152. As a result, Defendant is liable to Plaintiff for waiting time penalties, together with interest thereon, under Labor Code section 203.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following judgment:

1. Declaratory Judgment finding Defendant's conduct, as alleged herein, violated Plaintiff's rights pursuant to the California Labor Code;
2. For injunctive relief requiring Defendant to conduct training for supervisors, and management on the requirements of the Labor Code, the rights and remedies of those who allege a violation of the Labor Code, and to permanently prohibit Defendant from engaging in any future retaliatory acts against Defendant's employees.
3. An award of special damages;
4. An award of general damages;
5. An award of penalties pursuant to Labor Code § 203;
6. An award of punitive damages;
7. Award of reasonable attorneys' fees and costs pursuant to the California Labor Code;

8. Award of pre- and post-judgment interest;
9. For such other and further relief as the Court deems proper.

## DEMAND FOR A JURY TRIAL

Plaintiff Alejandro Villageliu hereby demands a jury trial on this matter.

Respectfully submitted,

Date: February 4, 2026

**QUINTANA HANAFI, LLP**

By: /s/ RH

Ramsey Hanafi
Gelian Belong
*Attorneys for Plaintiff*
Alejandro Villageliu

# EXHIBIT A

# EXHIBIT A

## *RxVantage, Inc.*

## Commission Plan Agreement

This Commission Plan Agreement ("***Plan***") is entered into by and between RxVantage, Inc. ("***Company***") and **Alejandro Villageliu** for calendar year 2024, effective January 1st through December 31st ("***Plan Year***").

This Plan will automatically renew and apply to subsequent fiscal years unless 1) this Plan is superseded, modified or canceled by the Company; or 2) you are no longer an Eligible Employee (as defined below).

The Company may modify the Plan at any time and from time to time, in its sole discretion, by providing notice of the modification. Changes will apply prospectively and will not reduce earned commission amounts before the date of modification.

### I. Definitions

***"CRM"*** means the Company's Customer Relationship Management (CRM) database.

***"Customer"*** means an Existing Customer or a New Customer.

***"Customer Agreement"*** means a master services agreement, statement of work ("***SOW***") or similar contract or agreement with a Customer that is fully executed with a valid signature by a duly authorized representative of the Company and the Customer. The executed contract or agreement document and any attachments must match the document(s) and attachment(s) approved by the Company's Chief Executive Officer or Chief Marketing Officer.

***"Eligible Employee"*** or ***"Participant"*** means an employee of the Company who meets the following requirements: 1) is in a sales position, which the Company has selected to participate in the Plan; 2) is working in that role on a full-time basis for the Company; 3) is actively performing that sales role; 4) is not currently under a Performance Improvement Plan (PIP), or subject to disciplinary action; and 5) fulfills all the requirements set forth in this Plan, including: a) signing this Plan and returning it to the Company's Chief Executive Officer, and b) meeting the Participant Obligations of employee's position as outlined below and as otherwise assigned to employee by the Company's Chief Executive Officer or SVP, Life Sciences from time to time in the ordinary course of business. Commission to a Participant who is out on unpaid leave of absence will be prorated based on the number of days that such Participant was on the job working unless otherwise required by law.

***"Eligible Sales"*** for purposes of this Plan and the incentives described herein, shall mean sales with Customers that satisfy all the following requirements:

1) The Participant (or Participant's Team member, as applicable) must be listed as the owner of the account or opportunity belonging to the Customer in the Company's CRM. In the event of any question over the ownership of an opportunity, Company shall determine the owner in its sole discretion; and

2) The Customer Agreement is directly attributable to, negotiated by, and closed as a result of the Participant's (or Participant's Team members, as applicable) direct efforts with the Customer.

***"Existing Customer"*** means a pharmaceutical, biotech, or other life sciences company with which the Company has an existing Customer Agreement.

***"New Business"*** means a Customer Agreement with a New Customer that is directly attributable to, negotiated by, and closed by the Participant (or Participant's Team member, as applicable). New Business also includes an SOW to a Customer Agreement with an Existing Customer for a greater number of licenses, or an SOW or addendum to a Customer Agreement that provides for materially different products or services that are not already captured by an existing Customer Agreement. The Company has sole and absolute discretion to determine whether an Eligible Sale constitutes New Business for purposes of this Plan. Commissions on New Business are only applicable during the first (1st) year following initial signing of the Customer Agreement.

"***New Customer***" or ***"New Logo"*** means a pharmaceutical, biotech, or other life sciences company with which the Company does not have a previous or existing Customer Agreement.

"***Expansion***" means the Revenue generated by the sale of a new product line(s) or a sale to a different business group within a company that was an Existing Customer as of January 1, 2024. This must be a different business group or unit within a Customer (e.g., if Company has a Customer Agreement with an Oncology group of a Customer, a sale to its Hematology group would be "Expansion"). The Company has sole and absolute discretion to determine whether an Eligible Sale is Expansion for purposes of this Plan. This does NOT include True-Up Revenue after year 1 of deal effective date

***"Renewal Business"*** means a renewal generated by Participant's sales team members of a Customer Agreement with an existing Company customer or account that is assigned to the Participant's sales team.

***"True Ups"*** shall be calculated quarterly based on the terms of the SOW. Revenue from True-Ups will retire quota and be paid commission during the first year of New Customer or Expansion Business only. Commission will not be paid on Renewal Business.

***"One-Time Fee Revenue"*** shall mean the revenue generated by the one-time fees such as set-up fee or customer integration. One-Time Fee Revenue does not count toward quota retirement. One-Time Fee Revenue will be paid a 1% commission.

"***Short Term Deals"*** shall mean any deal with a term less than 1 year. Short Term Deals do not count toward quota retirement and are paid at 50% the typical commission rate.

"***Revenue***" shall mean net revenues that are actually received and realized by the Company from Eligible Sales of New Business. Revenue shall exclude sales tax, withholdings and expenses, adjustments, and chargebacks due to nonpayment, returns, refunds, overpayments, fraud, administrative error, or similar issues resulting in nonpayment to the Company.

***"ACV Quota"*** shall mean the portion of your compensation plan based on Annual Contract Value. ACV calculations exclude one-time fees.

***"Multi-year Quota"*** shall mean the portion of your compensation plan based on Multi-year contract values. Deals are considered multi-year if the SOW exceeds 12 months without a renewal.

***"Quota Bonus 1"*** shall be the bonus paid if the Participant attains between 100-125% of quota. If attained, Quota Bonus 1 shall be paid annually at a rate of 1% of Participant's total ACV business booked. Only one quota bonus shall be applicable.

***"Quota Bonus 2"*** shall be the bonus paid if the Participant attains 125+%-150% of quota. If attained, Quota Bonus 2 shall be paid annually at a rate of 1.5% of Participant's total ACV business booked. Only one quota bonus shall be applicable.

***"Quota Bonus 3"*** shall be the bonus paid if the Participant attains greater than 150% of quota. If attained, the Quota Bonus 3 shall be paid annually at a rate of 2% of Participant's total ACV business booked. Only one quota bonus shall be applicable.

"***Sole Owner"*** shall mean the Participant who leads the pursuit of an opportunity. The Sole owner must be named as Opportunity Owner in SFDC with no shared splits.

***"Shared Owner"*** shall mean the Participant who leads the pursuit of an opportunity in combination with a Participant's Team Member. Quota retirement is calculated at 60% of total deal value. The Participant must be named as Opportunity Owner in SFDC. Chief Marketing Officer approves all shared opportunities.

***"Shared Secondary"*** shall mean the Team Member who supports the pursuit of an opportunity with a colleague. Quota retirement is calculated at 40% of total deal value. The Participant must be named as the Secondary Owner in SFDC. 1 Secondary per opportunity max. Chief Marketing Officer approves all shared opportunities.

***"Ignite"*** shall mean a Participant who helps to identify/kickstart a new sales opportunity that is won. Limited to EVP, Life Sciences and Enterprise Managers. CMO to approve in SFDC.

"***Team***" refers to the members of Participant's sales team, over whom Participant exercises direct supervisory control. In the event of any question over whether an individual is a Participant Team member, Company shall make a determination in its sole discretion.

## II. <u>Participant Obligations</u>

Participants are expected to fulfill certain general responsibilities as a condition of their employment with the Company, as part of their base salary, and in consideration of their eligibility to participate in the Plan. These responsibilities include (but are not limited to) the following ("***Participant Obligations***"):

a) Meeting and exceeding all objectives set for the Participant by Participant's direct supervisor and the Chief Executive Officer, as applicable.
b) Learning and effectively representing the Company's vision, products, and value proposition with skill and energy.
c) Providing exceptional service and care to Customers and ensuring that they remain loyal and engaged.
d) Conducting oneself with professionalism, ethics, and integrity.
e) Collaborating and cooperating effectively with colleagues.
f) Abiding by all Company sales processes and rules. The Company may, at any time and from time to time, add additional processes, rules etc., in its sole discretion and will provide written notice of same.

g) Abiding by all Company policies, procedures and guidelines, including without limitation the Company's Employee Handbook, as applicable.

h) Keeping the CRM accurately updated on a frequent basis with accurate forecasts.

i) Abiding by all terms of Participant's employment, including any offer letter and all agreements relating to employment (e.g., Company's Employee Invention Assignment and Confidentiality Agreement) (as applicable).

## III. Commission Structure and Calculation

**Commission Structure:** See 2024 Book of Business & Comp for reference.

Commissions are based on a percentage of Revenue from Eligible Sales of New, Expansion and Renewal Business attributable to the Participant (or Participant's Team members, as applicable), and is determined by revenue target attainment, as follows:

| **New/ExpansionACV**<br>Sell products or services to prospects | | |
|---|---|---|
| **YOUR 2024 QUOTA** | | **$2,200,000** |
| **If you are:** | **Commission** | **Quota Credit** |
| **Sole Owner** | 7% of Revenue from Eligible Sales | 100% Credit |
| **Owner**-Shared Opportunity | 60% of Eligible Commission | 60% Credit |
| **Secondary**-Shared Opportunity | 40% of Eligible Commission | 40% Credit |
| **Ignite** | 3% of Revenue from Eligible Sales | 0% Credit |
| **Ignite Renewal -** Must be approved in writing; See Carve Out Renewals | 3% of Revenue from Eligible Sales | 0% Credit |

Additional incentives

| **Category** | **Impact** |
|---|---|
| **NEW/EXPANSION - MULTI-YEAR**<br>Sell longer term deals when closing business | Add 1% to commission paid for each additional year of deal term.<br>Additionally, a 1% commission of the ACV will be earned at the start of each subsequent year of the mult-year deal |

| | |
|---|---|
| **PRODUCT ACCELERATORS**<br>Brand Space, Data, Launch Acceleration sales | Add 1% to commission paid for eligible revenue consisting of these paid products |
| **FAST START ACCELERATORS**<br>1 Achieve $800K in eligible sales Jan 1 - Jun 30, 2024<br>2.Achieve $1.2M in eligible sales Jan 1 - Jun 30, 2024 | 1. Base salary to increase to $300,000 on Jul 1<br>2. One time bonus paid $15,000 |

Commissions on New and Expansion Business are only applicable during the first (1st) year following initial signing of the Customer Agreement. Multi-year commissions will be paid out in the first (1st) year.

**Commission Calculation:** Commission amounts will be calculated by adding all Revenue from Eligible Sales and multiplying the sum by the applicable commission rate. This calculation shall be adjusted for order cancellation, non-acceptance by the Customer, non-payment of an invoice for a period of 60 days past due, credits, refunds, chargebacks or other adjustments that may occur.

Adjustments will be charged to the month for which the adjustment occurs and will be deducted from the next commission payment to Participant. If Participant is no longer employed by the Company at that time, Participant expressly agrees to promptly repay to Company any negative commission balance resulting from such adjustments. Participant's signature below constitutes Participant's written acceptance and authorization for Company to make lawful deductions from payments to the Participant, as permitted by law.

## IV. Conditions for Earning Commissions

Commissions are earned upon Company entering into a fully executed Customer Agreement with an applicable Customer while Participant is employed by the Company and will be calculable in accordance with Section III above.

Except as provided in this Section IV, Participant must be employed by the Company and must satisfy all Participant Obligations in order to be eligible to earn commissions. Participant shall not earn commissions after Participant's employment has been terminated, regardless of the reason for the termination; *provided however* that if Participant's employment is terminated by the Company without Cause (as defined herein), Participant shall be eligible to earn commissions (as calculated pursuant to Section III above) based on Company entering into a fully executed Customer Agreement with an applicable Customer while Participant is employed by the Company and according to the amounts indicated for Participant in Company's commission tracker located within the CRM at 2024 Commission Tracker as of Participant's employment termination date, subject to Participant's execution of a general release of claims in a form satisfactory to the Company. For purposes of this Plan, "***Cause***" shall mean Participant's: (a) commission of any felony or crime involving dishonesty; (b) participation in any fraud against the Company; (c) material breach of Participant's obligations to the Company; (d) intentional damage to any property of the Company; (e) misconduct, or other violation of Company policy that causes harm; or (f) breach of this Plan agreement, the Employee Invention Assignment and Confidentiality Agreement, or any other written agreement with the Company.

## V. Payment of Commissions

Commissions are paid within 30 calendar days of Company's receipt of full payment from an applicable Customer. Such payments are subject to chargeback for refund, rebate, sales discount, or return of the product or service. Chargebacks are applied to the next commission

payment and will be deducted from Participant's retired quota. After employment termination, chargebacks are applied against the final commission payment. The timing of commission payments may be modified or delayed—to the extent permitted by applicable law—in the event that commissions are not yet earned or calculable.

By your signature below, you agree to promptly repay to Company any negative commission balance resulting from such adjustments. You hereby authorize the Company to apply chargebacks to commission payments, or if commission payments are insufficient, to any amounts owed to the employee by the Company, including salary, expense reimbursements, bonus, or accrued vacation pay. If not repaid from final salary, expense reimbursements, or accrued vacation, or other payments made by the Company, then the unpaid balance becomes a debt to the Company.

## VI. Additional Terms

**Tax Withholding.** All amounts paid under this Plan are subject to the satisfaction of any federal, state, or local income tax requirements and to any applicable employment tax, social security or national insurance withholding. Participant acknowledges that to the extent permitted by applicable law, any tax consequences arising from the amounts paid in connection with this Plan shall be borne solely by such Participant, and Company may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to such Participant pursuant to the Plan.

**At-Will Employment.** Nothing in this Plan shall be interpreted as constituting a promise (express or implied) that employment for an employee is for any minimum or fixed term, that "cause" is required for termination of employment, or that Company is required to provide notice before termination. Company reserves the right to terminate the employment of its employees in the United States "at will" with or without notice and with or without cause.

**Governing Law.** This Plan shall be governed by the laws of the State of California, without regard to conflicts of laws. The parties further agree and consent to venue and jurisdiction in the state or federal courts located in Los Angeles, California, for any disputes arising under this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Plan for the Plan Year first set forth above.

I acknowledge and agree to the terms set forth above.

______________________________ ______________
Participant Signature Date

Alejandro Villageliu
Participant Name (Print)

**RXVANTAGE, INC.**

By: ____________________________ ______________
Dan Gilman Date

Its: Chief Executive Officer

# EXHIBIT B

EXHIBIT B

rxvantage

October 28, 2020

Dear Alejandro,

We are delighted to extend this offer of employment for the position of Executive Vice President – Head of Enterprise with RxVantage, Inc. ("the Company.") Please review this summary of terms and conditions for your anticipated employment with us. If you accept this offer, your start date will be November 1, 2020 or another mutually agreed upon date and you would report to Daniel Gilman.

---

Please find below the terms and conditions of your employment, should you accept this offer:

**1. Position**. Your title will be Executive Vice President – Head of Enterprise, and you will report to Daniel Gilman. This is a full-time position. While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company. By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company.

**2. Cash Compensation**. The Company will pay you a starting salary at the rate of Two hundred and fifty thousand dollars ($250,000.00) per year payable in accordance with the Company's standard payroll schedule. This salary will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time.

**3. Commission Potential**. In addition, you will be eligible to receive commissions based on the Incentive Fee Agreement attached hereto at Appendix C, and incorporated herein.

**4. Stock Options** Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase sixty thousand (60,000) shares of the Company's Common Stock (the "Option"). The exercise price per share of the Option will be determined by the Board of Directors or the Compensation Committee when the Option is granted. The Option will be subject to the terms and conditions applicable to options granted under the Company's 2019 Stock Incentive Plan (the "Plan"), as described in the Plan and the applicable Stock Option Agreement. You will vest in 25% of the Option shares after 12 months of continuous service, and the balance will vest in equal monthly installments over the next 36 months of continuous service, as described in the applicable Stock Option Agreement. Stock Options already approved and granted by the Company's Board of Directors, known in Carta as ES-146, shall remain in effect and continue to vest if or when milestones are achieved.

**5. Employee Benefits** As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits. In addition, you will accrue 160 hours of Paid Time Off (PTO) per year, in accordance with the Company's PTO policy.

**6. Proprietary Information and Inventions Agreement**. Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Proprietary Information and Inventions Agreement, a copy of which is attached hereto as **Exhibit A.**

rxvantage

**7. Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you). While employed by the Company you will comply with the Company's policies and procedures.

**8. Tax Matters.**

**A Withholding.** All forms of compensation referred to in this letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

**B Section 409A.** For purposes of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), each salary continuation payment under Section 5 is hereby designated as a separate payment. If the Company determines that you are a "specified employee" under Section 409A(a)(2)(B)(i) of the Code at the time of your Separation, then (i) the salary continuation payments under Section 5, to the extent that they are subject to Section 409A of the Code, will commence on the first business day following (A) expiration of the six-month period measured from your Separation or (B) the date of your death and (ii) the installments that otherwise would have been paid prior to such date will be paid in a lump sum when the salary continuation payments commence.

**C Tax Advice**. You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or the Board related to tax liabilities arising from your compensation.

**9. Interpretation, Amendment and Enforcement.** This letter agreement supersede and replace any prior agreements, representations or understandings (whether written, oral, implied or otherwise) between you and the Company and constitute the complete agreement between you and the Company regarding the subject matter set forth herein. This letter agreement may not be amended or modified, except by an express written agreement signed by a duly authorized officer of the Company. The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company (the "Disputes") will be governed by California law, excluding laws relating to conflicts or choice of law. You and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in Los Angeles County, California in connection with any Dispute or any claim related to any Dispute.

rxvantage

We hope that you will accept our offer to join RxVantage. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me.

This offer, if not accepted, will expire at the close of business on November 13, 2020. This offer is contingent upon your successful completion of all pre-employment requirements, including proof of authorization to work in the United States and successful completion of a background screening. Your employment is also contingent upon your starting work with the Company on or before November 1, 2020.

If you have any questions, please call me at 310-853-1978.

****

Sincerely,

DocuSigned by:
FEA331AD8E0947A...

Daniel Gilman
CEO
RxVantage, Inc.

rxvantage

# EXHIBIT A

## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

The following confirms and memorializes an agreement that RxVantage, Inc., a Delaware Corporation (the "Company"), and I, Alejandro Villageliu have had since the commencement of my service, past and present, with the Company in any capacity, and for which I hereby acknowledge receipt of ample consideration:

1. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement or my service with Company. I will not violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my services or otherwise on behalf of Company. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

2. Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my service with Company to the fullest extent allowed by California Labor Code Section 2870 (which is attached as Appendix A) (collectively "Inventions") and I have and will continue to promptly disclose all Inventions to Company. Without disclosing any third party confidential information, I will also disclose anything I believe is excluded by Section 2870 so that the Company can make an independent assessment. I hereby make all assignments necessary to accomplish the foregoing. **In addition, in the event that any inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information relating to the business of the Company were made or conceived or reduced to practice, in whole or in part, by me prior to the existence of the Company ("Prior Inventions"), I hereby assign all right, title and interest in such Prior Inventions to the Company, except as excluded on Appendix B.** I shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.

3. If anything created by me prior to my employment relates to Company's actual or proposed business, I have listed it on Appendix B in a manner that does not violate any third party rights or disclose any confidential information. Without limiting Section 1 or Company's other rights and remedies, if, when acting within the scope of my employment or otherwise on behalf of Company, I use or (except solely on Appendix B pursuant to this Section 2) disclose my own or any third party's confidential information or intellectual property (or if any Invention cannot be fully made, used, reproduced, distributed and otherwise exploited without using or violating the foregoing), Company will have and I hereby grant Company a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sub-licensable right and license to exploit and exercise all such confidential information and intellectual property rights.

4. To the extent allowed by law, paragraph 2 includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral

rxvantage

Rights by or authorized by Company and agree not to assert any Moral Rights with respect thereto. I will confirm any such ratifications, consents and agreements from time to time as requested by Company.

5. I agree that all Inventions, Prior Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I previously or in the future develop, learn or obtain during the term of my service that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine.

6. During my employment with the Company and for a one (1) year period thereafter, I will not directly or indirectly solicit away employees or consultants of the Company for my own benefit or for the benefit of any other person or entity, nor will I encourage or assist others to do so.

7. I agree that my obligations under paragraphs 2, 3, 4, 5 and 6 of this Agreement shall continue in effect after termination of my service, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraphs 2, 3, 4 and 6 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of Company, it subsidiaries, successors and assigns.

8. Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable California law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. This Agreement is fully assignable and transferable by Company, but any purported assignment or transfer by me is void. I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be a adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

[Signature Page Follows]

rxvantage

**SIGNATURE PAGE**

**I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, IN DUPLICATE, WITH THE UNDERSTANDING THAT THE COMPANY WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.**

DocuSigned by:
Alejandro Villageliu
132DA733BDE243B...

Name:

Alejandro Villageliu

Date: 10/29/2020

Accepted and Agreed to:

RxVantage, Inc

DocuSigned by:
By: [signature]
FEA331AD8E0947A...

Name: Daniel Gilman
Title: CEO

rxvantage

**APPENDIX A**

California Labor Code Section 2870. **Application of provision providing that employee shall assign or offer to assign rights in invention to employer.**

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(i) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(ii) Result from any work performed by the employee for his employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

rxvantage

**APPENDIX B**

PRIOR MATTER

N/A

rxvantage

## APPENDIX C

INCENTIVE FEE AGREEMENT

DocuSign Envelope ID: 866AF060-2292-4CA7-B396-AD8AE7C94134

## EXHIBIT C

***RxVantage, Inc.***

**Incentive Fee Agreement –**

**Village Consulting LLC**

This Incentive Fee Agreement ("***Agreement***") is entered into by and between RxVantage, Inc. ("***Company***") and Village Consulting LLC for calendar year 2020, effective January 1st through December 31st, unless otherwise terminated earlier pursuant to the Consulting Agreement.

The Company may modify this Agreement at any time and from time to time, in its sole discretion, by providing notice of the modification. Changes will apply prospectively and will not reduce earned incentive fee amounts before the date of modification.

**I. Definitions**

***"CRM"*** means the Company's Customer Relationship Management (CRM) database.

***"Customer Agreement"*** means a master services agreement, statement of work ("SOW") or similar contract or agreement with an Eligible Customer that is fully executed with a valid signature by a duly authorized representative of the Company and the Eligible Customer. The executed contract or agreement document and any attachments must match the document(s) and attachment(s) approved by the Company's Chief Executive Officer and provided by to the Participant for execution.

***"Eligible Customer"*** for purposes of this Agreement means a pharmaceutical, biotech, or other life sciences company with which the Company does not have a previous or existing Customer Agreement. For purposes of this Agreement, Eligible Customer shall also expressly exclude those companies and/or accounts listed in **Attachment 1** to this Agreement.

***"Participant"*** means a consultant of the Company who meets the following requirements: 1) be in a sales position, which the Company has selected to participate in the Agreement; 2) be actively performing that sales role; 3) fulfill all the requirements set forth in this Agreement, including: a) Signing this Agreement and returning it to the Chief Executive Officer, and b) Meeting the Participant Obligations of as outlined below and as otherwise assigned to you by the Company's Chief Executive Officer from time to time in the ordinary course of business.

***"Eligible Sales"*** for purposes of this Agreement and the incentives described herein, shall mean sales with Eligible Customers that satisfy all the following requirements:

1) The Participant must be listed as the owner of the account and opportunity belonging to an Eligible Customer in the Company's CRM. In the event of a dispute over the ownership of an opportunity, Company shall determine the owner in its sole discretion.

2) The Customer Agreement is directly attributable to, negotiated by, and closed as a result of the Participant's direct efforts with an Eligible Customer; and

***"New Business"*** means a new Customer Agreement with a new Eligible Customer that is directly attributable to, negotiated by, and closed by the Participant. **New Business includes a SOW with an existing Eligible Customer for a greater number of licenses, or a SOW that provides for materially different services that are not already captured by an existing Customer Agreement.** Incentive Fees on New Business may only be earned for the first year of the lifespan of the customer account, MSA or SOW. The Company's CEO has sole and absolute discretion to determine in good faith whether an Eligible Sale constitutes New Business for purposes of this Agreement. Incentive Fees on New Business are only applicable during the first (1st) year following initial signing of the Customer Agreement.

***"Renewal Business"*** means a renewal of a Customer Agreement with an existing Company customer or account (excluding those listed on Attachment 1) that is directly attributable to, negotiated by, and closed by the Participant. Renewal Business includes renewal of a SOW for the same amount of licenses, regardless of any price increases. **For example, a SOW with a higher price for the same amount of licenses is treated as Renewal Business.** The Company's CEO must provide advance approval of all renewals in order to be counted as Renewal Business that is eligible for incentive fees. Incentive Fees on Renewal Business are only applicable during the three (3) year period after initial signing of the Customer Agreement.

"***Revenue***" shall mean net revenues that are actually received and realized by the Company from Eligible Sales of New Business and Renewal Business. Revenue shall exclude sales tax, withholdings and expenses, adjustments and chargebacks due to nonpayment, returns, refunds, overpayments, fraud, administrative error, or similar issues resulting in nonpayment to the Company.

## II. Participant Obligations

Participants are expected to fulfill certain general responsibilities as a condition of their engagement by the Company, as part of their base salary, and in consideration of their eligibility to participate in this Agreement. These responsibilities include (but are not limited to) the following ("***Participant Obligations***"):

a) Abiding by all terms of all contractual and legal obligations to the Company, including without limitation the Consulting Agreement, including any and all Statement(s) of Work that may be entered into from time to time.
b) Conducting oneself with professionalism, ethics, and integrity.
c) Abiding by all Company sales processes and rules. The Company may, at any time and from time to time, add additional processes, rules etc., in its sole discretion and will provide written notice.
d) Keeping the CRM accurately updated on a frequent basis with accurate forecasts.

rxvantage



## III. Incentive Fee Structure and Calculation

**New Business Incentive Fee Structure:** Incentive Fees are based on a percentage of Revenue from Eligible Sales of New Business attributable to the Participant, and is determined by Participant's revenue target attainment, as follows:

| Tier | Revenue Target (Annualized) | New Business Incentive Fee Rate |
|---|---|---|
| Tier 1 | Up to $1,000,000 | 15% of Revenue from Eligible Sales |
| Tier 2 | Over $1,000,000 up to $2,000,000 | 7% of Revenue from Eligible Sales |
| Tier 3 | Over $2,000,000 | 7% of Revenue from Eligible Sales |

Incentive Fees on New Business in Tier 2 will be eligible for a 3% bonus if achieved prior to the 6 month anniversary of the Effective Date of this agreement.

Incentive Fees on New Business are only applicable during the first (1st) year following initial signing of the Customer Agreement. Each Incentive Fee Rate only applies to Revenue from Eligible Sales over that Revenue Target.

**Renewal Business Incentive Fee Structure:** Incentive Fees are equal to **three percent (3%)** of Revenue from Eligible Sales of Renewal Business attributable to the Participant, limited to the first three (3) years from initial date of closing, as follows:

| Year | Renewal Business Incentive Fees Rate |
|---|---|
| Years 1 - 3 | 3% of Revenue from Eligible Sales |
| Years 4+ | 0% of Revenue from Eligible Sales |

If more than one Participant performs work relating to an Eligible Sale, the Company's CEO has discretion to allocate the incentive fee among the Participants who performed work relating to the Eligible Sale.

**Incentive Fee Calculation:** Incentive Fee amounts will be calculated by adding all Revenue from Eligible Sales and multiplying the sum by the applicable Incentive Fee Rate. This calculation shall be adjusted for order cancellation, non-acceptance by the customer, non-payment of an invoice for a period of 60 days past due, credits, refunds, chargebacks or other adjustments that may occur.

Adjustments will be charged to the month for which the adjustment occurs and will be deducted from the next Incentive Fee payment to Participant. If Participant is no longer engaged as a consultant by the Company at that time, Participant expressly agrees to promptly repay to Company any negative Incentive Fee balance resulting from such adjustments. Participant's signature below constitutes his written acceptance and authorization for Company to make lawful deductions from payments to the Participant, as permitted by law.

## IV. Conditions for Earning Incentive Fees

Incentive Fees are not earned until the payment has been received from the Eligible Customer in full and are calculable in accordance with Section III above. Consultant shall not earn Incentive Fees after the Consulting Agreement has been terminated, regardless of the reason for the termination; provided however that if Consultant's engagement is terminated by Company without Cause, Consultant shall be eligible to earn Incentive Fees on Revenues from Eligible Sales of New Business that are actually received by Company within 120 calendar days of Consultant's termination date. For purposes of this Agreement, "Cause" shall mean: (a) commission of any felony or crime involving dishonesty; (b) participation in any fraud against the Company; (c) material breach of your obligations to the Company; (d) intentional damage to any property of the Company; (e) misconduct, or other violation of Company policy that causes harm; or (f) breach of this Agreement, the Confidentiality Agreement, or any other written agreement with the Company.

## V. Payment of Incentive Fees

Incentive Fees are paid within 30 calendar days of the Company's receipt of full payment from an Eligible Customer. Such payments are subject to chargeback for refund, rebate, sales discount, or return of the product. Chargebacks are applied to the next Incentive Fees payment. After termination of the Consulting Agreement, chargebacks are applied against the final Incentive Fee payment. The timing of Incentive Fee payments may be modified or delayed—to the extent permitted by applicable law—in the event that Incentive Fees are not yet earned or calculable.

By your signature below, you agree to promptly repay to Company any negative Incentive Fee balance resulting from such adjustments. You hereby authorize the Company to apply chargebacks to Incentive Fee payments, or if Incentive Fee payments are insufficient, to any amounts owed to you by the Company. If not offset from other payments made by the Company, then the unpaid balance becomes a debt to the Company.

## VI. Additional Terms

**Tax Withholding.** Participant acknowledges that to the extent permitted by applicable law, any tax consequences arising from the amounts paid in connection with this Agreement shall be borne solely by such Participant.

rxvantage



**Governing Law.** This Agreement shall be governed by the laws of the State of California, without regard to conflicts of laws. The parties further agree and consent to venue and jurisdiction in the state or federal courts located in Los Angeles, California for any disputes arising under this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the day and year first set forth above.

**I acknowledge and agree to the terms set forth above provision.**

DocuSigned by: Alejandro Villageliu — 3/31/2020

**Participant Signature** — **Date**

Alejandro Villageliu — Village Consulting LLC

**Participant Name (Print)** — **Participant Compay (Print)**

**RXVANTAGE, INC.**

By: DocuSigned by: Daniel Gilman — 4/1/2020

**Daniel Gilman** — **Date**

**Its: Chief Executive Officer**

# EXHIBIT C

EXHIBIT C

**California Secretary of State**
Electronic Filing

FILED
Secretary of State
State of California

# Corporation - Statement of Information

| | |
|---|---|
| Entity Name: | RXVANTAGE, INC. |
| Entity (File) Number: | C3049590 |
| File Date: | 03/30/2022 |
| Entity Type: | Corporation |
| Jurisdiction: | DELAWARE |
| Document ID: | H370374 |

**Detailed Filing Information**

1. Entity Name: RXVANTAGE, INC.

2. Business Addresses:
   a. Street Address of Principal Office in California:

   b. Mailing Address: 225 Dyer Street, Floor 2
   Providence, Rhode Island 02903
   United States of America

   c. Street Address of Principal Executive Office: 225 Dyer Street, Floor 2
   Providence, Rhode Island 02903
   United States of America

3. Officers:
   a. Chief Executive Officer: Daniel Gilman
   29 Knapton Street
   Barrington, Rhode Island 02806
   United States of America

   b. Secretary: Daniel Gilman
   29 Knapton Street
   Barrington, Rhode Island 02806
   United States of America

Document ID: H370374

**California Secretary of State**
Electronic Filing

Officers (cont'd):

c. Chief Financial Officer: Thomas Case
13 Glastonbury Place
Laguna Niguel, California 92677
United States of America

4. Director: Not Applicable

Number of Vacancies on the Board of Directors: Not Applicable

5. Agent for Service of Process: Thomas Case
13 Glastonbury Place
Laguna Niguel, California 92677
United States of America

6. Type of Business: Software as a Service

No Officer or Director of this Corporation has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

By signing this document, I certify that the information is true and correct and that I am authorized by California law to sign.

Electronic Signature: Genevieve Lauck



Document ID: H370374